Filed 1/29/21 P. v. Bellows CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B298706 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA432450) |
| v. | |
| ANTIONE L. BELLOWS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Douglas Sortino, Judge.  Affirmed.

Judith Kahn, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Senior Assistant Attorney General, Steve Oetting, Supervising Deputy Attorney General, and Amanda Lloyd, Deputy Attorney General, for Plaintiff and Respondent.

At age 18, defendant Antione Bellows (defendant) pointed a gun at Jesus Vasquez (Vasquez) and attempted to rob him. A struggle for the gun ensued, with bystanders coming to Vasquez's aid, and the gun discharged—killing Vasquez. After a trial, the jury convicted defendant of murder, found true an alleged robbery-murder special circumstance, and further found defendant personally and intentionally discharged a firearm causing death. Defendant now asks us to decide whether the jury instruction on the special circumstance allegation was defective because it did not require the jury to find defendant personally killed Vasquez. We also decide whether defendant can seek retroactive relief under Senate Bill 1437 on direct appeal, whether defendant's life without possibility of parole sentence (plus a 25-year determinate term) is cruel or unusual, and whether statutes affording early parole consideration for juvenile offenders deny defendant equal protection of the laws.

## I. BACKGROUND

A. *The Offense Conduct, as Established by the Evidence at Trial*

Defendant was four months beyond his 18th birthday on December 17, 2014.[1] That evening, Vasquez (also known as Chuy) and Francisco Cardenas (Cardenas) ate and drank at a taco stand run by Miguel Bernal (Bernal). The taco stand was set up outside Bernal's store, Mike's 99. Both Vasquez and Cardenas lived down the street from the store.

---

[1] Defendant was a member of the Rollin' 40s criminal street gang and known to go by the moniker "Nsane Number 5."

2

Vasquez stayed at the taco stand when Cardenas walked home to shower. Sometime after 10:00 p.m., while only Vasquez and Bernal remained at the taco stand, Vasquez asked Bernal for a cigarette, and Bernal went into his store to get one.

As Bernal exited the store, he heard Vasquez call for help and saw him fighting with a young man and a young woman. None of the testifying witnesses saw the beginning of the confrontation, but surveillance video showed defendant approach Vasquez, point a gun at him, and hit and kick him while his co-defendant, Nicole Issiah (Issiah), reached into Vasquez's pockets. Defendant then pursued Vasquez behind a van.

Bernal saw Vasquez with his hands on the barrel of the gun, trying to take it from defendant. Bernal then joined the fray and called to a neighbor, Jose Enriquez (Enriquez), also known as Cholo, for help.

Vasquez, Bernal, and defendant continued to struggle for control of the gun, and all three had their hands on the weapon. At some point the gun discharged; Bernal recalled only one shot being fired. Bernal could not remember who was holding the gun's grip when it fired, but he thought defendant was holding the barrel. Vasquez fell to the ground just before Enriquez reached them. Defendant and Issiah fled, and Bernal flagged down a passing car for help.

Vasquez died of a single gunshot wound to the head. The only other injuries to his body noted by the medical examiner were some lacerations and abrasions on his forehead and some abrasions and bruises on his legs. Los Angeles Police Department (LAPD) detective Eloy Ochoa processed the crime scene. Among other things, officers found two nine-millimeter cartridge cases near a van parked in front of Bernal's store.

3

Inside the van, they found a gun magazine that was several bullets short of its capacity. On the other side of a nearby fence, officers found an unloaded nine-millimeter firearm. LAPD criminalist Annette Woiwode (Woiwode) testified the cartridges found in the street and a bullet fragment she received from the coroner were fired from the gun found at the scene.

Several weeks after Vasquez was killed, in February 2015, Detective Ochoa and his partner interviewed Robert Reeves (Reeves), who indicated he had information about the homicide when he was cited for illegal possession of marijuana.[2] Reeves is a gang member with several felony convictions. During the interview, Reeves told Detective Ochoa and his partner he was aware that a "Mexican" "innocent bystander" had been killed at the intersection where Mike's 99 is located. A man he knew by the moniker Tiny Insane told Reeves "[h]e was the one who killed . . . the Mexican guy." Detective Ochoa testified that Reeves showed him a photo of defendant and identified him as Tiny Insane.

After defendant's arrest, the police arranged for a paid, trained civilian to be placed in defendant's cell to "engage [defendant] in conversation to obtain statements." Excerpts of the conversation between defendant and the paid agent were played at trial. Among other things, defendant told the agent he and a woman were "out walking through the 30's. And this Mexican was standing by a van. And he was whistling, bro . . . . And then like 20 Mexicans coming out of nowhere, trying to kill me. So we struggling and shit, struggling for the th[i]ng. I put

---

[2]     Reeves also had a robbery case pending at the time. Reeves testified he received no benefit for his testimony in this case.

4

one in their head and did what I had to do and shit . . . ." When the agent asked defendant whether police had the gun, defendant replied, "Yeah, they got everything. And they got this bullshit ass, uh, picture on cameras of—but you couldn't tell that was me. It didn't even look like me."

LAPD criminalist Brian Kim (Kim) analyzed DNA collected from, among other things, Vasquez's fingernails and the grips and trigger of the murder weapon. Both Vasquez and defendant's DNA was found under Vasquez's fingernails: Vasquez was the major contributor, and defendant was the minor contributor.[3] Only Vasquez's DNA was found on the grips and trigger. Kim explained, however, that touching an object "does not guarantee" that DNA is left behind.

### B. *Verdict and Sentencing*

The jury convicted defendant of first degree murder and unlawful possession of a firearm (Pen. Code,[4] § 29820, subd. (b)). With respect to the murder, the jury found true an allegation that defendant committed the murder while engaged in the crime of attempted robbery, a special circumstance. (§ 190.2, subd. (a)(17).) It also found true several firearm enhancements alleged under section 12022.53, including, as particularly relevant for our purposes, an allegation that defendant personally and

---

[3] More precisely, the minor contributor's DNA was consistent with defendant, and Kim testified he would expect to see the minor contributor's DNA in approximately one in 10 million unrelated individuals.

[4] Undesignated statutory references that follow are to the Penal Code.

intentionally discharged a firearm causing great bodily injury or death.  (§ 12022.53, subd. (d).)

The trial court sentenced defendant to life in prison without the possibility of parole for the murder plus a consecutive term of 25 years to life for the personal discharge of a firearm enhancement.  The other aspects of defendant's sentence are not relevant to our resolution of this appeal.

## II.  DISCUSSION

The special circumstance allegation instruction given to the jury, patterned on CALCRIM No. 730, told the jury it could find the allegation true so long as defendant "did an act that caused the death of another person," regardless of his intent or whether he was a major participant in the robbery.  But the instruction did not inform the jury that this standard applies only if it found he was the victim's "actual killer," i.e., that he personally killed the victim.  (§ 190.2, subd. (b).)  Assuming the instruction was defective, the error did not affect defendant's substantial rights.  The jury's finding that defendant personally and intentionally discharged a firearm causing death or great bodily injury necessarily means the jury concluded defendant personally killed Vasquez.  And that means the special circumstance allegation true finding cannot rest on a legally invalid theory.

The remainder of defendant's contentions are also unavailing.  He is not entitled to argue for retroactive application of Senate Bill No. 1437 on direct appeal.  As we held in *People v. Martinez* (2019) 31 Cal.App.5th 719 (*Martinez*) and as our Supreme Court recently confirmed in *People v. Gentile* (2020) 10 Cal.5th 830 (*Gentile*), defendant must instead proceed by way of a section 1170.95 petition filed in the trial court.  Defendant also

6

has not carried his burden to demonstrate his sentence constitutes cruel or unusual punishment. And the limitation of early parole consideration to juvenile offenders (which excludes defendant because he was 18 when he killed Vasquez) is supported by a rational basis and does not contravene constitutional equal protection principles.

### A. Any Defect in the Special Circumstance Instruction Was Harmless

Section 190.2, the special circumstance statute, provides "(a) [t]he penalty for a defendant who is found guilty of murder in the first degree is death or imprisonment in the state prison for life without the possibility of parole if . . . [¶] (17) [t]he murder was committed while the defendant was engaged in, or was an accomplice in, the commission of, attempted commission of, or the immediate flight after committing, or attempting to commit . . . [¶] (A) [r]obbery in violation of Section 211 or 212.5." (§ 190.2, subd. (a)(17)(A).)

The statute distinguishes between someone who is an "actual killer" and others who are not (though still guilty of murder). Generally, the actual killer "need not have had any intent to kill at the time of the commission of the offense which is the basis of the special circumstance" for the statute to apply. (§ 190.2, subd. (b).) But for those who are not actual killers, a special circumstance can only be found true if, "with the intent to kill," the person "aids, abets, counsels, commands, induces, solicits, requests, or assists any actor in the commission of murder in the first degree" (§ 190.2, subd. (c)) or if "with reckless indifference to human life and as a major participant," the person "aids, abets, counsels, commands, induces, solicits, or

7

assists in the commission of" certain felonies and is convicted of first degree murder (§ 190.2, subd. (d)).

Section 190.2, subdivision (b) does not define the phrase "actual killer," but our Supreme Court has held that "[a] felony-murder special circumstance is established even absent intent to kill, premeditation, or deliberation, if there is proof beyond a reasonable doubt that the defendant *personally killed* the victim in the commission or attempted commission of, and in furtherance of, one of the felonies enumerated in subdivision (a)(17) of section 190.2. [Citations.]" (*People v. Jennings* (1988) 46 Cal.3d 963, 979, emphasis added.)

The trial court here instructed the jury as to the special circumstance allegation with instructions based on CALCRIM Nos. 703 and 730.

The instruction based on CALCRIM No. 703 explained, in pertinent part, that "[i]f the defendant was not the actual killer, then the People have the burden of proving beyond a reasonable doubt that he or she acted with either the intent to kill or with reckless indifference to human life and was a major participant in the commission or attempted commission of robbery for the special circumstance to be true." The instruction stated "[t]he People do not have to prove that the actual killer acted with intent to kill or with reckless indifference to human life in order for the special circumstance of felony murder to be true."

The instruction patterned on CALCRIM No. 730 provided, in pertinent part, that "[t]o prove that this special circumstance is true, the People must prove that:

"1. The defendant committed or attempted to commit, or aided and abetted the commission or attempted commission of robbery;

"2. The defendant intended to commit or intended to aid and abet the perpetrator in the commission or attempted commission of robbery;

"3. If the defendant did not personally commit or attempt to commit robbery, then a perpetrator, whom the defendant was aiding and abetting before or during the killing, personally committed or attempted to commit robbery;

"AND

"4. The defendant or the perpetrator in the commission or attempted commission of the robbery *did an act that caused the death of another person*." (Emphasis added.)

In *People v. Garcia* (2020) 46 Cal.App.5th 123 (*Garcia*), the Court of Appeal held CALCRIM No. 730's reference to "an act that caused the death of another person" permitted the jury to consider the defendant's special circumstance liability based on a legally invalid theory. (*Id*. at 155.) Specifically, the instruction permitted the jury to find the special circumstance to be true based on the theory that the defendant was the actual killer by virtue of having handed a roll of tape to a confederate who then killed the victim by using it to cover the victim's mouth. (*Id*. at 149.) The Court of Appeal held "[t]he jury should have been instructed that it could find true the special circumstance under sections 190.2(a)(17)(A) and (b) only if the prosecution proved beyond a reasonable doubt that [the defendant] 'personally killed' [the victim]." (*Id*. at 155.)

In this case, defendant argued Bernal's testimony that defendant's hand was on the barrel of the gun when it fired and the absence of defendant's DNA on the grips and trigger suggested someone other than defendant pulled the trigger. Defendant now argues the instruction as worded allowed the jury

9

to find the special circumstance true even if, like the defendant in *Garcia*, his "act that caused the death of another person" was merely placing the gun in the hands of someone else—Vasquez, Bernal, or Enriquez—who accidentally shot Vasquez.

We accept for the sake of argument that the instruction as given was defective for the reasons articulated in *Garcia*. We also do not dwell on the question of whether the issue is forfeited for lack of a contemporaneous objection because we may review an instructional error that affects a defendant's substantial rights. (Pen. Code, § 1259; *People v. Scott* (2015) 61 Cal.4th 363, 400.) But defendant's substantial rights were not affected, and any instructional error was harmless beyond a reasonable doubt (*Chapman v. California* (1967) 386 U.S. 18, 24), because the record shows the jury necessarily found defendant personally killed Vasquez.

As we have already mentioned, an actual killer is a person who personally kills another (a category narrower than those who do an act that is the proximate cause of another's death). In addition to finding true the special circumstance alleged under section 190.2, the jury found true the allegation that defendant personally and intentionally discharged a firearm causing great bodily injury or death to Vasquez (§ 12022.53, subd. (d)). As to the section 12022.53, subdivision (d) enhancement, the jury was properly instructed that the People must prove "defendant personally discharged a firearm during the commission of [murder]," he "intended to discharge the firearm," and these actions "caused great bodily injury to or the death of a person." Thus, the jury's true finding on this enhancement and the testimony regarding the cause of death necessarily means the jury found defendant personally killed Vasquez—which means

10

the "actual killer" theory on which the jury was instructed for purposes of the special circumstance was valid. There can accordingly be no prejudicial error affecting defendant's substantial rights.[5] (See *People v. Valdez* (2002) 27 Cal.4th 778, 792 [failure to properly instruct on willfulness element of substantive offense not prejudicial because jury was properly instructed that enhancement found true required willfulness].)

> B.     *Defendant Is Not Entitled to Reversal of His Murder Conviction Via a Retroactive Application of Senate Bill 1437*

Defendant contends Senate Bill 1437 applies retroactively to him and the jury instructions given in this case did not

---

[5]     Defendant contends the jury's finding as to the firearm enhancement is not probative as to prejudice because it "did not attach to the special circumstance." The factual issue of whether defendant personally shot and killed Vasquez, however, was identical.

Defendant does not challenge the sufficiency of the evidence supporting either the special circumstance or the section 12022.53, subdivision (d) firearm enhancement findings, but he suggests "the evidence showed he did not personally kill Vasquez because his hands were on the barrel when it discharged." This assertion, based on Bernal's testimony and the absence of defendant's DNA on the grips and trigger, does not account for defendant's admissions to Reeves and the paid informant-cellmate that he personally shot Vasquez. It also does not grapple with LAPD criminalist Kim's testimony that a person might handle a gun without leaving DNA, which, in combination with surveillance video showing defendant handling the gun's grips, undermines the probative value of the absence of defendant's DNA from the grips and trigger.

11

properly define the elements of felony murder based on an "actual killer" theory under section 189, subdivision (e)(1), as amended. In *Martinez, supra*, 31 Cal.App.5th 719, we held a defendant whose conviction was not yet final when Senate Bill 1437 took effect may not seek retroactive relief on direct appeal and instead must proceed by way of a petition pursuant to section 1170.95. (*Id*. at 724.) Defendant urges us to reverse course and repudiate *Martinez*, but our Supreme Court—citing *Martinez*—recently came to the same conclusion as we did in that case. *(Gentile, supra*, 10 Cal.5th at 851-852.) Defendant must file a section 1170.95 petition in the trial court to seek retroactive relief under Senate Bill 1437, and we express no view, beyond what we have already said, on whether he merits such relief.

> C.   *Defendant's Sentence Is Not Cruel and Unusual*
> 1.   *Eighteen-year-old offenders may be sentenced to life without parole*

The Eighth Amendment to the United States Constitution, applicable to the states via the Fourteenth Amendment, prohibits cruel and unusual punishment. The Supreme Court has emphasized that "children are constitutionally different from adults for purposes of sentencing" (*Miller v. Alabama* (2012) 567 U.S. 460, 471 (*Miller*)) and has held sentences of life in prison without the possibility of parole are cruel and unusual with respect to certain juvenile offenders. In *Graham v. Florida* (2010) 560 U.S. 48 (*Graham*), the Court held that a sentence of life in prison without parole is "not appropriate" for a juvenile non-homicide offender because it represents "an irrevocable judgment about [the offender's] value and place in society"

12

without accounting for juveniles' "capacity for change and limited moral culpability." (*Id*. at 74.)

Defendant contends the same considerations of juveniles' diminished culpability and capacity for change discussed in *Graham* and *Miller* render a sentence of life without the possibility of parole cruel and unusual in his case (where the crime was committed after his 18th birthday). Although the Supreme Court has acknowledged "[t]he qualities that distinguish juveniles from adults do not disappear when an individual turns 18," it has also emphasized "a line must be drawn." (*Roper v. Simmons* (2005) 543 U.S. 551, 574 (*Roper*).) "The age of 18 is the point where society draws the line for many purposes between childhood and adulthood." (*Ibid.* [holding the Eighth Amendment prohibits the death penalty for juvenile offenders].)

Similarly, the courts of this state have repeatedly held the Eighth Amendment does not prohibit sentences of life without parole for offenders only slightly older than 18. In *People v. Argeta* (2012) 210 Cal.App.4th 1478 (*Argeta*), the Court of Appeal held that the rationale applicable to the sentencing of juveniles did not apply to a defendant who committed first degree murder months after his 18th birthday: "Making an exception for a defendant who committed a crime just five months past his 18th birthday opens the door for the next defendant who is only six months into adulthood. Such arguments would have no logical end, and so a line must be drawn at some point. We respect the line our society has drawn and which the United States Supreme Court has relied on for sentencing purposes, and conclude [the defendant's] sentence is not cruel and/or unusual under *Graham*, *Miller*, or [*People v.*] *Caballero* [(2012) 55 Cal.4th 262]." (*Argeta*,

13

*supra*, at 1480; accord *People v. Abundio* (2013) 221 Cal.App.4th 1211, 1220-1221; *People v. Perez* (2016) 3 Cal.App.5th 612, 617; *People v. Edwards* (2019) 34 Cal.App.5th 183, 190 (*Edwards*); see also *In re Jones* (2019) 42 Cal.App.5th 477, 483 (*Jones*) ["Drawing a bright line at age 18 establishes an objective and easily implemented measure, which has been used by the United States Supreme Court for sentencing purposes"].)  We follow these cases and conclude a life without parole sentence for defendant is not unconstitutional merely because of his age at the time of the offense.[6]

### 2. The sentence is not disproportionate to the offense

Even if defendant's age does not render his sentence unconstitutional, it still must not be disproportionate to his offense.  "The Eighth Amendment . . . contains a 'narrow proportionality principle' that 'applies to noncapital sentences.' [Citations.]" (*Ewing v. California* (2003) 538 U.S. 11, 20 (plur. opn. of O'Connor, J.), quoting *Harmelin v. Michigan* (1991) 501

---

[6] Defendant's contention that *Argeta* and other cases decided before *Montgomery v. Louisiana* (2016) ___ U.S. ___ [136 S.Ct. 718] (*Montgomery*) must be reevaluated lacks merit.  In *Montgomery*, the Supreme Court held it announced a new substantive rule in *Miller* that applies retroactively because it "did more than require a sentencer to consider a juvenile offender's youth before imposing life without parole; it established that the penological justifications for life without parole collapse in light of 'the distinctive attributes of youth.' [Citation.]" (*Montgomery*, *supra*, 136 S.Ct. at 734.)  Nothing in *Montgomery* casts doubt on the distinction between juvenile and adult offenders or drawing that distinction at 18 years of age.

14

U.S. 957, 996-997 (*Harmelin*).)  This principle forbids "'only extreme sentences that are "grossly disproportionate" to the crime.' [Citations.]" (*Id*. at 23, quoting *Harmelin, supra*, at 1001.)  A defendant must overcome a "considerable burden" when challenging a penalty as cruel or unusual.  (*People v. Wingo* (1975) 14 Cal.3d 169, 174.)

"'Article I, section 17, of the California Constitution separately and independently lays down the same prohibition'" against punishments disproportionate to a defendant's personal responsibility and moral guilt.  (*People v. Marshall* (1990) 50 Cal.3d 907, 938.)  A punishment may violate article I, section 17 of the California Constitution if "it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity."  (*In re Lynch* (1972) 8 Cal.3d 410, 424 (*Lynch*).)  We assess three factors in making this determination:  (1) "the nature of the offense and/or the offender, with particular regard to the degree of danger both present to society" (*id*. at 425); (2) how the sentence compares "with the punishments prescribed in the same jurisdiction for different offenses which, by the same test, must be deemed more serious" (*id*. at 426); and (3) how the sentence compares "with the punishments prescribed for the same offense in other jurisdictions having an identical or similar constitutional provision" (*id*. at 427).

Defendant's argument is limited to the first *Lynch* factor. With respect to the nature of the offense, "viewed in the abstract robbery-murder presents a very high level of . . . danger, second only to deliberate and premeditated murder with malice aforethought." (*People v. Dillon* (1983) 34 Cal.3d 441, 479 (*Dillon*).)  But we do not consider the offense only in the abstract.

15

(*Ibid*.)  Defendant contends his culpability is diminished because he did not personally kill Vasquez.  As we have already discussed, however, the jury found otherwise.

Defendant also contends the offense is mitigated by the violent resistance he faced from Vasquez, Bernal, and Enriquez. Defendant contends the struggle over the gun in this case is comparable to the facts in *Dillon*, in which a juvenile defendant raided a marijuana grow operation with friends and shot a grower who pointed a gun at him.  (*Dillon*, *supra*, 34 Cal.3d at 482-483.)  Our Supreme Court held the *Dillon's* sentence of life without the possibility of parole was unconstitutional in light of "ample evidence that because of his immaturity [defendant] neither foresaw the risk he was creating nor was able to extricate himself without panicking when that risk seemed to eventuate." (*Id*. at 488.)  Here, by contrast, defendant initiated the confrontation by pointing a gun at Vasquez, who was unarmed. Defendant then unilaterally escalated to physical violence and pursued Vasquez behind the van rather than fleeing when he had an opportunity to do so.

Defendant's individual culpability is determined "by such factors as his age, prior criminality, personal characteristics, and state of mind."  (*Dillon*, *supra*, 34 Cal.3d at 479.)  As the trial court emphasized, defendant was convicted of robbery as a juvenile, received "some rehabilitative effort," and then escalated his criminal behavior by robbing somebody with a gun. Defendant contends his conduct is partially attributable to Attention Deficit/Hyperactivity Disorder (ADHD), dysfunctional executive functioning, and his use of drugs and alcohol on the day of the murder.  As the trial court observed, however, the only evidence of defendant's drug use were his self-serving statements

16

to a psychologist. And although this was not a particularly sophisticated crime demonstrating significant advance planning, defendant repeatedly chose to escalate the conflict.

The fact that defendant eventually found himself outnumbered by bystanders attempting to disarm him was not, like the sudden appearance of the armed grower in *Dillon*, an unforeseen hazard from which he could not escape—it was the culmination of his successive decisions not to turn away from a robbery that was not proceeding as anticipated. Even in the midst of the struggle for the gun, there is no evidence that defendant was acting defensively. Bernal testified that, apart from punches thrown by Issiah, he and the others were struggling for control of the gun rather than hitting each other. (The defensive character of Vasquez, Bernal, and Enriquez's conduct is highlighted by the fact that Enriquez threw the gun over a fence when defendant dropped it.)

The sentence imposed reflects the circumstances of the murder, defendant's criminal history, and defendant's personal characteristics—chiefly as demonstrated by his conduct during the robbery. The sentence defendant received is undoubtedly stiff given his age, but not unconstitutionally so. It is not disproportionate to the offense and does not violate the state or federal constitutional prohibitions against cruel or unusual punishment.

D.     *Sections 3051 and 1170 Do Not Violate Equal Protection Principles*

Defendant highlights two statutory provisions by which juvenile offenders sentenced to life in prison without the possibility of parole may eventually be considered for parole or

17

resentencing.  Section 3051, subdivision (b)(4) provides that "[a] person who was convicted of a [crime] that was committed before the person had attained 18 years of age and for which the sentence is life without the possibility of parole shall be eligible for release on parole at a youth offender parole hearing during the person's 25th year of incarceration."  (§ 3051, subd. (b)(4).) Section 1170, subdivision (d)(2)(A)(i) provides, subject to certain exceptions, that "[w]hen a defendant who was under 18 years of age at the time of the commission of the offense for which the defendant was sentenced to imprisonment for life without the possibility of parole has been incarcerated for at least 15 years, the defendant may submit to the sentencing court a petition for recall and resentencing."  (§ 1170, subd. (d)(2)(A)(i).)

Because the offense conduct in this case occurred several months after defendant's 18th birthday, defendant will not benefit from either section 3051, subdivision (b)(4) or section 1170, subdivision (d)(2)(A)(i).  Defendant's equal protection challenge to this exclusion, raised for the first time on appeal, is a facial challenge.  (*Edwards*, *supra*, 34 Cal.App.5th at 192, citing *In re Sheena K.* (2007) 40 Cal.4th 875, 885.)

"'The Fourteenth Amendment to the United States Constitution and article I, section 7 of the California Constitution guarantee all persons the equal protection of the laws.' [Citation.]" (*Jones*, *supra*, 42 Cal.App.5th at 481.)  "The concept of equal protection recognizes that persons who are similarly situated with respect to a law's legitimate purposes must be treated equally.  [Citation.]  Accordingly, "'[t]he first prerequisite to a meritorious claim under the equal protection clause is a showing that the state has adopted a classification that affects two or more similarly situated groups in an unequal manner.'"

[Citation.]" (*People v. Brown* (2012) 54 Cal.4th 314, 328.) If two classes of criminal defendants subject to different sentencing rules are similarly situated, "courts look to determine whether there is a rational basis for the difference. [Citation.] '[E]qual protection of the law is denied only where there is no "rational relationship between the disparity of treatment and some legitimate governmental purpose."' [Citation.]" (*Edwards*, *supra*, 34 Cal.App.5th at 195.)

Even if we assume young adult defendants are similarly situated to juvenile offenders with respect to their capacity for change and moral culpability, "a line must be drawn" (*Roper*, *supra*, 543 U.S. at 574), and there is a rational basis for doing so at 18. In *Jones*, *supra*, the Court of Appeal considered a 19-year-old defendant's equal protection challenge to section 1170, subdivision (d)(2). (*Jones*, *supra*, 42 Cal.App.5th at 483.) It concluded that "[d]rawing a bright line at age 18 establishes an objective and easily implemented measure, which has been used by the United States Supreme Court for sentencing purposes. While a different line could have been drawn, it is not entirely arbitrary to limit section 1170(d)(2) to individuals who committed their crimes before they were 18 years old." (*Ibid*.)

The Court of Appeal's reasoning in *Jones* with respect to section 1170, subdivision (d)(2) is persuasive, and it applies with equal force to 3051, subdivision (b)(4). As the Supreme Court acknowledged in *Roper*, drawing a line at 18 years does not perfectly distinguish immature offenders from mature offenders: "The qualities that distinguish juveniles from adults do not disappear when an individual turns 18. By the same token, some under 18 have already attained a level of maturity some adults will never reach." (*Roper*, *supra*, 543 U.S. at 574.) But "'[a]

19

classification is not arbitrary or irrational simply because there is an "imperfect fit between means and ends"' [citation] or 'because it may be "to some extent both underinclusive and overinclusive"' [citations]." (*Johnson v. Dept. of Justice* (2015) 60 Cal.4th 871, 887.)  The lines drawn in section 3051, subdivision (b)(4) and section 1170, subdivision (d)(2)(A)(i) rationally "target the youngest, and presumably most deserving, of the group of youthful offenders whose brains were still developing and whose judgment had not yet matured.  While young adults share many of the attributes of youth, they are by definition further along in the process of maturation, and the law need not be blind to the difference." (*Jones*, *supra*, 42 Cal.App.5th at 482.)

DISPOSITION

The judgment is affirmed.


NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS


BAKER, Acting P. J.

We concur:


MOOR, J.


KIM, J.


21